For the record, Justice Tom Appleton will be sitting in on this case. He will have full benefit of the oral argument, which is being recorded. He is the 4th District Representative. He also has the briefs as well. So there will be a full panel on this case. Thank you. You may proceed. Thank you, Your Honor. Counsel. We're here today on appeal of the Circuit Court's reverse of the Commission. Who are you? I'm sorry, Your Honor. Who are you? Oh, I'm sorry. Randall Sladek on behalf of Rochelle Petro Travel Plaza. Thank you. Sorry, Your Honor. Circuit Court's reversal was under the premise that the Commission's decision was against the manifest weight of the evidence. Manifest weight has been covered at length today. But basically, the Circuit Court believed that an opposite conclusion was clearly apparent and compelled by the clearly evident, plain, and indisputable weight of the evidence. I think the facts disagree with that. What the Circuit Court could not do and didn't have the province to do was to substitute their judgment for the Commission's. So when we examine the facts in the case, the question is whether the facts support the Commission's finding in any way. This case begins on December 20, 2005. Ms. Nava is at home, slips and falls on ice. She goes to the ER and reports that she has a shoulder injury. The record reads, 43-year-old female fell at 8 a.m. today at home. She injured her right shoulder. She rates the pain at 3 out of 10. She has never had this before. On examination, there's no bruising or swelling, but she cannot abduct beyond 30 degrees. And she's tender both anteriorly and laterally to the shoulder joint. An X-ray taken at the time was negative for broken bones. Final diagnosis there, contusion and tendinitis to the right shoulder. She's given a sling. And she's to follow up with Dr. Osmani. From this point on, she treats with this Dr. Osmani. By way of background, Dr. Osmani is board certified as a physician from the United Kingdom. He is not an orthopedist. He is not board certified in America. And he is not a shoulder surgeon or expert. And he had previously performed a hysterectomy on Ms. Nava. According to Dr. Osmani, Ms. Nava never told him that her injury had occurred at work previous to 2005. He's a family physician, and starting in 2004 and over the next 16 months before this shoulder incident, he treats her for the following complaints, gastroenteritis, abdominal pain, constipation, dysmenorrhea, uterine fibroids, incontinence, urinary frequency, knee sprain, anxiety, osteoarthritis, and headaches. I bring this up because it's a litany of symptoms covering different body parts, but there is no mention of the right shoulder. In 21 months, he saw the doctor 16 times. And like I said, this covered all types of ailments. Yet, she would have you believe that over that period of time, she was having shoulder pain and never said a word of it to Dr. Osmani. The questions raised during the treatment with Dr. Osmani support the commission's finding of no convincibility and their dislike of his opinion in this case. And this is before we even start examining the real opinions of Dr. Osmani in the case. I've covered his lack of expertise. I've covered that he was a treater for other symptoms. But when we look at his opinions in this case, I find them lacking, and so did the commission. January 4, 2006, after reviewing the MRI, he says that the MRI does suggest a rotator cuff injury, and he says that it's work-related chronic and repetitive strain. He cites that the vague injury of fall that Ms. Nava gave was not consistent with the findings that she did not have a fracture or a bruise. In his deposition, Dr. Osmani was asked, what are her work duties? Quote, I didn't go into details of the description of her job. Dr. Osmani was asked, did you review the ER records when she described the fall? Quote, no, I didn't. If you look at the ER records, he's copied on them. He was furnished a copy of them and claims he never saw them. Did you argue this case before the circuit court? Yes, I did, Your Honor. I see the order in the file. It doesn't state any particular findings or reasoning. Other than the order, did the judge give any explanation just out of curiosity for the decision? No, he did not. Okay. We can go into the medical records ad nauseum. This case is a case where you've got Osmani giving one opinion and you've got Carlson giving another opinion, and the commission chose Carlson. So I suppose your argument is that it's not against the manifest way of the evidence because there is some evidence in the record that supports the opinion of Carlson as being more convincing than that of Osmani. Is that right? You're right, Your Honor. Okay. And so, I mean, ultimately you've cut to the chase on my argument, Your Honor. And with Dr. Osmani, I would just like to point out some of the flaws. If you wanted to believe that the commission was totally wrong and that they could rely on Dr. Osmani, and just point out some of the continuing flaws in his opinion, where he says things like if the ER doctor thought there was an acute tear, he would have gotten an x-ray. There was an x-ray. Dr. Osmani just never reviewed it. Dr. Osmani said if she fell on ice with an outstretched hand, you would normally get a fracture. Well, I think that goes against reason. People fall all the time and it doesn't mean they're fracturing bones in their hands or their arms. And according to Dr. Osmani, you can fall on ice and suffer a sprain to your shoulder but not a tear. A sprain is a mild tear. Dr. Osmani went out of his way to demonstrate. They had no expertise in this matter. The commission found that Dr. Osmani's opinion was troubling. He never knew what the job duties were. He didn't really even know what she did for a living, but yet he found it okay to say that her shoulder symptoms were related to her job. The commission relied on Dr. Carlson. He's a board-certified orthopedist. It showed in his opinions he was able to explain things found in the MRI and the surgical and during surgery. For all the shortcomings of Dr. Osmani, he really gives us guidance in what we should do in this case. Quote, when they asked Dr. Osmani about his opinion in the deposition, he said, an orthopedic surgeon would know much better than I when they look at it because they see a lot more than I do, whether the tear is acute or chronic. So he's discrediting his own opinion right there. We're here because the circuit court did not follow the standard of review. It wasn't a de novo review of the circuit court. It was the manifest wage standard. The circuit court cannot substitute a judgment for the commission. I request that that decision be overturned. Thank you, counsel. Good morning. Jennifer Heastwater on behalf of Honoria Nava, which was the petitioner in this case. I did not handle the appeal below, but I guess one issue that was not raised in the briefs, and if this is inappropriate for me to raise, by all means, I would invite you to tell me that it's inappropriate, is whether there's appropriate jurisdiction here. I just took over the file, but the circuit court actually reversed this on accident and causal connection. So in reviewing the file that I just took over, I guess the question that I had is why jurisdiction wasn't raised in the brief, and I do apologize that it was not raised in our brief, as whether this should have gone back to the commission first for findings on, for a war basically on permanency and all other issues, based upon the fact that the circuit court reversed on accident. Is it reasonable to conclude that the commission, or what the circuit court meant or implied was that he was reinstating the arbitrator's decision? Well, I think what the circuit court, and again, if I'm bringing up an issue that is inappropriate, by all means, stop me, because I just took over this file a couple of weeks ago, due to an attorney leaving, but it was always my understanding. Two weeks ago, did you say? Yes. You know, you could have filed something in that two weeks if you wanted to raise this issue, but. And again, I probably should have, but it was always my understanding that if there's no finding of accident, or causal connection, and no, and essentially an award is vacated by the commission, or there's no award entered, then when the circuit court reverses and says no, there's an accident, there's causal connection, that there then have to be findings of fact by the commission, before we come back up here. So I just wanted to point that out. I do apologize, as I think it may be inappropriate to bring it up at this point, but I'm concerned that there could be a jurisdictional issue here, and that maybe we're here earlier than we should be. It's something, obviously, for us to look at. What about the merits of this? Regarding the merits of the case and the manifest weight of the evidence, what the commission did here is, they essentially adopted Dr. Carlson's opinion, and I understand manifest weight here is a high burden. However, the problem with Dr. Carlson's opinion is not that, oh, I'm going to sit here and argue that they just should choose between the doctors, but there are significant flaws in Dr. Carlson's opinion. Before we get into the flaws, is that all that really happened here? The commission discredited Dr. Osmani, and they did it specifically, they said, because of his lack of knowledge of the claimant's job duties. So they didn't just decide they didn't like Osmani, they had a specific basis for discrediting his testimony, they also noted the surgeon who did the aberration on the rotator cuff did not offer any theory either with respect to causation. So it isn't just a matter of believing Carlson in deciding not to believe Osmani, there were some other things going on, wasn't there? There was, and that's correct. However, to suggest that Dr. Gabriel gave no opinion is erroneous. Obviously, Dr. Gabriel can give an opinion without testifying, and I'm sure you see several cases, even at this level, where there may be no testimony, it's just medical evidence. Dr. Gabriel put right in his February 7, 2006 records, and it's quoted on page 5 of our findings of fact, he talks about the MRI, and he indicates that the spur and the cystic changes were indications of chronic inflammation, so this would fit with her having a history of shoulder pain prior to her tear. There are multiple things in our findings of fact, mainly pages 5 through 7, where we point out where Dr. Gabriel, in his medical records, supports causal connection here. Why didn't he give an opinion on causal connection when he was aware the claimant was maintaining her condition? Because there's no requirement under the act that we would have had to take his evidence deposition. There are opinions in his medical records indicating this is consistent with her having prior chronic problems. I mean, there are findings there, so in addition to Dr. Osamian, the commission basically looks at it and says, well, essentially what they're saying is because Dr. Gabriel didn't testify on her behalf, he gave no opinion. And to come to that conclusion is erroneous, because you could try and win a case with no testimony. The question is, what does the medical evidence show? Dr. Gabriel's records consistently point out that she had chronic changes, that she had changes consistent with repetitive trauma here. And when you come back to the theory of a contributory cause, the fact that she had these chronic findings, that she had findings in the operative report and findings that were noted not only by Dr. Osamian, but also Dr. Gabriel, that were consistent with repetitive motion, repetitive strain to the shoulder, for the commission to then conclude her repetitive work was not a contributory cause, is against the manifest weight of the evidence. Is it true that there's nothing in the record that indicates she ever complained about her shoulder before she fell at home? That is not true. She testified as to shoulder complaints. She testified that my shoulder was bothering me before, but is there any, did anybody else say they ever heard her complain? Is there any medical record, any indication other than her testimony? There is no medical record. And that is another thing I wanted to point out with Dr. Carlson, because he said she had no history of shoulder problems. Well, his conclusions are based upon that, but to say she had no history of medical treatment for shoulder problems is true. To say that she had no history of shoulder problems, I mean, the commission didn't come out and say, we don't believe her. She testified that she had a history of shoulder problems, but she never sought medical treatment for them, but that she was having pain. There was significant testimony here that this was a very good worker. She was having problems with her shoulder. And so the question becomes, you know, is she punished for the fact that until she fell, she went in? And does it really matter if the fall also contributed? And I think, although I know we're looking at the commission decision here, the arbitrator goes into the Vogel standard and the intervening accident a little bit more, but the question becomes, couldn't they have both contributed? And was there enough here to cut off a causal connection? There's significant medical evidence here in Dr. Gabriel's medical records and Dr. Osami, which I admit the commission seemed to reject his opinion, but significant. Can't they do that? They can, but if you look at the evidence in total, they discounted multiple things that I think here would suggest that the opposite conclusion is apparent here. I mean, we have records of Dr. Gabriel in operative reports specifically laying out that she had chronic inflammation and that she had these notable conditions in her shoulder, which were due to repetitive stress that were not consistent with the trauma that wouldn't have happened from an acute fall. Well, I mean, I think you've done an arguably good job of pointing out some of the, you know, questions regarding the testimony of Carlson, the issues with regard to the testimony of the chain of events. But then again, as I said, the commission specifically felt that there was a problem with Osami's testimony because of his lack of knowledge of the claimant's job duties. They also were troubled by the fact that the surgeon didn't, you know, opine a causal connection even though he could have. So there's obviously arguable flaws in all of the evidence here and what it boils down to is, is there sufficient evidence in the record to support the commission's finding? And clearly you have Carlson squarely against the claimant's position. You do. However, Carlson admitted, I'm going to find the quote. This is Respondents Exhibit Number 2, page 14, and I apologize because I'm not exactly sure if I have the transcript number, but he stated there's really no way to tell several months out whether this was a single acute injury or more of a chronic tear. He admitted there were flaws to his own opinion here. He didn't see the MRI films. He wasn't the one who performed the arthroscopic surgery. And I think another flaw by the commission is the suggestion, again, that Dr. Gabriel did not offer any theory with respect to causation. Dr. Gabriel didn't testify. That doesn't mean that Dr. Gabriel didn't offer a theory as to causation. Again, it's right in his medical records. And I think it's erroneous for the commission to basically just discount his medical records and say he didn't offer a theory. You know what, maybe you would have won, but you should have gotten his testimony. Well, there's no requirement that you have his testimony. It is directly in the medical records. And to suggest that because there's no deposition transcript of his opinion, doesn't mean that his opinion is not in the record. And his opinions are in the record, and his opinions support the finding here that she had findings in her shoulder consistent with repetitive strain and findings in her shoulder consistent with a chronic problem, which he went on to state would fit her having a history of shoulder pain prior to her tear. So she gave him an adequate history. I was having problems with my shoulder. No, I never sought medical treatment, but I was having pain. And so the fact that there's overwhelming medical evidence here that this woman's shoulder had what was much more than what would be found on an acute fall, and even Carlson admitted that it could be true, there's no way for me to tell. And maybe he would have been able to tell if he had the MRI films, because the MRI was not done too long after this fall. I think the MRI was done December 29th, the date of accident, the date of diagnosis. Just to put it simply, if her repetitive work activities, which were pretty extensive, I mean, her work, if it was causing tears, but yet when she falls at home where there is clearly a tear that must be surgically repaired, is that compensable? If the repetitive work would have in any way contributed, and it's my understanding, and I'll have to find it here, because I do believe that it was Dr. Gabriel's notes again, wherein he talks about basically the makeup of the tear and the way that the tear occurred, that it was not consistent with an acute tear, but more consistent with the fraying or the tearing that you would experience over time. With the repetitiveness, which is in Dr. Gabriel's notes, this was an obviously chronic tear, as the edges were well rounded off, and then he went on to indicate further, but in his medical records, he states in there that it is more consistent with the tear that would have happened over time, as opposed to I fell and experienced a tear. Now, and I'm not sure, Your Honor, if this is exactly what you're asking, but if it had started to tear or she was having these degenerative changes and then she fell and it tore more, would it still be compensable? And I think that's why the arbitrator maybe went into the Vogel issue, which the commission did not touch at all, as was there enough of an intervening accident if something had developed where work would still not be on the hook? And I think the answer is it would still be compensable, because there's no indication that she was at MMI, which is what they had talked about in Vogel, or that her condition had been completely resolved and this fall created a completely new condition. There may be some overlap here as to what happened in the fall and what was chronic, but there's no doubt, and this is, I guess, why I feel so strongly that this is against the manifest way to the evidence, there is no doubt that there were chronic, repetitive changes that had gone on in this woman's shoulder that were not caused by a fall. And Dr. Carlson couldn't even come out and say, no, absolutely everything was caused by a fall. He said, well, it's hard to tell. And this is someone who hadn't seen the MRI films. Maybe it's not so hard to tell when you look at them. And so the medical evidence here shows not necessarily that nothing happened from the fall, but that most of this is consistent with repetitive strain and chronic changes that would have taken place before this fall. And again, I mean, this MRI and these reports, Office Notes of January 4th, I mean, the MRI is December 29th. We're talking about a small period of time here where they're looking at this and saying, these are chronic changes. This is from repetitive strain and work over time, not from I fell the other day. So then your argument would be that her present condition of ill being is related to this chronic tearing, which is work related. And that is correct. And by saying that, I'm not saying the fall may not have also contributed. I don't think it matters. I think that's why there was the Vogel discussion, because we're talking about a contributory cause. Let's say the fall did contribute to it, but she was in a weakened condition. Is that still compatible? I think the answer, Your Honor, would be yes. I mean, I think it would be yes. She already in this situation, because basically with a contributory cause, she already had this condition. The fact that something might have worsened it and also contributed to it doesn't take out the fact that the work accident played a role. Before we go to what was the evidence that the Commission should have credited or found that she had a chronic condition? Predominantly on page three of the arbitration decision, where they basically discount Dr. Gabriel's opinions by saying he didn't give it. He didn't offer any theory with respect to causation. Well, Dr. Gabriel didn't testify and didn't give any narrative report or anything. It was just in his operative report he said this was a chronic condition because the edges were rounded off. And in his medical records. Is that correct, first of all? That is correct in his operative report. And that, whatever was in his operative report about it being rounded off was directly contradicted by the respondent's IME position who said, you know, if you have a month or two between an injury and the time you do the surgery, it often looks rounded off. True. So they had competing. I think on that particular finding, that is true. Dr. Carlson, again, didn't see the original MRI, so I don't know what his opinion would have been. I think we're talking about the findings on the scope. But there is more in Dr. Gabriel's records than that note in the operative report. There are office notes which indicate prior to that when he's discussing the MRI, and he's aware of her history. These are preoperative notes. Is that what you're talking about? February 7, 2006, I believe, which is an actual office note. This is on page 5 of our findings. Okay, my question is this was preoperative? This was preoperatively, correct. And he's discussing the MRI and talks about the fact that there are spurs and cystic changes which would fit with her having the history of prior shoulder pain. And I think Dr. Osami also testified to that. Before the arbitrator counsel, did you argue that this was a result of an aggravation of a preexisting condition? No, before the arbitrator, and, again, I was handling it. You even proceeded to implore below that, did you? No, and I'm not necessarily, I guess, arguing that. I mean, I think her preexisting condition, which she came into the MRI with, the argument and the medical evidence has shown was due to repetitive strain from her work activity, which contributed, and to chronic changes. I think Dr. Osami. Counsel, your time is up. Okay, thank you. You have time and rebuttal. Thank you, Your Honor. Excuse me. Not rebuttal. Let me get your rebuttal. What about this jurisdiction? Your Honor, it was a final order from the circuit court, and all issues have been decided, and so. Well, but, you know, he can't make it a final order by saying it's a final order, and either it is or it isn't. Now, the commission reversed the arbitrator. That's right. They say they considered all issues and reversed the arbitrator. Now, he reverses the commission. So does that mean he's affirmed the arbitrator? That he's adopted the arbitrator's decision? That would be my understanding of the order. My implication would not express that. No, there's no express. I mean, if he wanted the commission to reevaluate all of these things, wouldn't he have had to remand it? And he didn't. I mean, it's not a well-drawn order, but there's no remand. That's correct, Your Honor. So does that weigh in favor of believing that he adopted the arbitrator's decision to reverse the reversal? That's yes. I believe that's why we would be here today. All right. Okay. And I wanted to address the discussion of Dr. Gabriel. Can a circuit court adopt an arbitrator's decision? Well, you instruct the commission to do it. Was there any instruction to do that? No. Well, Section 19F provides that if you set aside the commission's decision and there are sufficient facts in the record for the court to decide the case, the court can enter any order that could have been entered. Yeah. Go ahead. We're having our discussion among ourselves here. Like you listened in on the accomplishments. You may continue. Okay. Thank you, Your Honor. I just want to quickly address, it looks like we're trying to shift away from Dr. Asmati and talk about Dr. Gabriel and what he said. And I think there's just a small segment of what's in counsel's brief and what the doctor said was, so this would fit with her history of having shoulder pain prior to her tear. So he's not saying the tear existed previously. He's saying that this tear just happened. And so even if we believe that she had pain prior, it really is irrelevant because the tear did not exist based on what Dr. Gabriel is saying. So with that, I'll conclude. Thank you. Thank you, counsel. This matter will be taken under advisement. This position shall issue for a standing recess until 1-3.